CHARLES C. CANTRELL AND JOSEPHINE S. CANTRELL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cantrell v. Commissioner
Docket No. 1354-74.
United States Tax Court
T.C. Memo 1978-237; 1978 Tax Ct. Memo LEXIS 281; 37 T.C.M. (CCH) 1022; T.C.M. (RIA) 78237; June 26, 1978, Filed James A. Comiskey and Michael E. Coney, for the petitioners. Joseph R. Goeke, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined a deficiency *282 in petitioners' Federal income tax in the amount of $29,730.09 for the taxable year 1969. The sole issue for our determination is the amount of the casualty loss suffered by petitioners in 1969 as a result of damage to their property caused by Hurricane Camille. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the attached exhibits, are incorporated herein by this reference. Petitioners are Charles C. Cantrell and Josephine S. Cantrell, husband and wife, whose legal residence at the time of filing of the petition herein was New Orleans, Louisiana. They timely filed their joint Federal income tax return for the taxable year 1969 using the cash basis of accounting. Since Josephine S. Cantrell is a party to this proceeding solely by virtue of having filed joint income tax returns with her spouse, Charles C. Cantrell will therefore be referred to herein as petitioner. On August 17, 1969, Hurricane Camille struck portions of Hancock County, Mississippi including petitioner's property. Prior to the hurricane the property had been substantially improved and was classified in the real estate industry as an estate. *283 The physical improvements included a main house, consisting of 3,502 square feet of living space. The main house was centrally heated and air conditioned, and also contained approximately 900 square feet of screened porch and 225 square feet of open decking. It was in excellent condition and had been substantially improved shortly before the hurricane. The property also contained a guest house with 850 square feet of living area and 280 square feet of screened porch. This was a frame dwelling with asbestos roof, in good condition. Additionally, the property contained a barbeque house with a built-in sink, refrigerator, television, and cabinets, as well as a large open barbeque pit. The barbeque house was near an inground swimming pool, 20 feet X 50 feet with a 4-foot apron, a diving board, and two ladders. The property was also improved with a graden house, consisting of an open tool shed, 20 feet X 33 feet, and an enclosed, heated shop with sink and cabinets. Finally, there was a pump house and toilet, outside lighting, fencing, gates, a pier, and bridges. The property is oblong in shape with about 516 feet fronting the nearest main road. The property extends in *284 from the road nearly 4,000 feet to the edge of Rotten Bayou, a navigable stream. The property has 750 feet of frontage on the bayou, and is served by a private road owned by petitioners, extending in from the public road and running nearly the length of the property on one side. At the time of the hurricane, virtually the entire 37.8 acre tract was landscaped and lawned in a park-like condition. Petitioner had developed the park-like quality of the property over a period of 25 years, regularly employing at least two men to help with the work. Azaleas, camellias, wisteria, and other assorted shrubs enhanced the appearance of the property throughout the site. Sprawling pines blended with this shubbery and flora to provide the park-like appearance of the estate. At the time of the hurricane, petitioner was spending approximately $50,000 a year to maintain the landscaping and park-like quality of the estate. On August 17, 1969, Hurricane Camille struck petitioner's property with winds of between 150 to 190 miles per hour, inflicting devastating damage. The hurricane winds destroyed 2,300 full grown pine trees. A substantial number of wisteria trees were also destroyed, and the *285 destruction of the trees and foliage inhibited the natural growth and development of even those wisteria that survived. The landscaping, including the azaleas, camellias, and other shrubbery and flora were substantially destroyed. Extensive damage to the buildings on the property was also caused by Hurricane Camille. However, the damage to the buildings and other structural improvements was covered by insurance, and the structural improvements were returned to their pre-hurricane condition. Since the structural improvements were insured and returned to their pre-hurricane condition, the dispute dividing the parties is over the difference in the fair market value of the property immediately before and immediately after the hurricane as a result of the damage to the pine trees, wisteria, azaleas, camellias, and the other shrubbery and foliage, landscaping and terrain improvements that gave the property its park-like quality. As a result of the damage caused to his property by the hurricane, petitioner claimed a casualty loss of $94,186.83. [1] In his deficiency notice, respondent reduced the loss by $41,103.16 to $53.083.67. *286 OPINION On August 17, 1969, Hurricane Camille inflicted devastating damage on petitioner's park-like estate, virtually destroying the trees, foliage, ornamental shrubbery, and other landscaping. Petitioner claimed a total casualty loss of $94,186.83. Respondent reduced the loss to $53,083.67. The difference ($41,103.16 after accounting for the $100 deductible required by section 165(c)(3)) produced a deficiency of $29,730.09. The parties agree on a number of items entering into the total casualty loss, including cleanup expenses (labor, stump removal and certain other expenses) totaling $21,963.44. The principal differences center on two items: (1) A dispute over whether the difference in the fair market value of the property immediately before the hurricane and immediately after the hurricane was $59,000 as contended by petitioner or $25,200 as contended by respondent. [2] (2) A dispute as to whether the overall decline included the damages attributable to ornamental shrubbery or whether a separate $12,000 loss is specifically attributable to this item. *287 The hornbook law applicable to this dispute is clear and undisputed. Section 1.165-7(b)(1)(i), Income Tax Regs., provides that the amount of loss to be taken into account under section 165(a) is "[the] amount which is equal to the fair market value of the property immediately before the casualty reduced by the fair market value of the property immediately after the casualty." [3]Helvering v. Owens,305 U.S. 468 (1939). The loss to real property held for personal use is measured by valuing the property as a whole with all the improvements--landscaping, plants, trees, and other shrubbery and foliage--considered as integral parts in arriving at the fair market value before and after the casualty. Section 1.165-7(b)(2)(ii) Income Tax Regs.; Western Products Co. v. Commissioner,28 T.C. 1196, 1219 (1957). Additionally, this regulation contemplates an appraisal of the fair market value before and after the casualty which must "recognize the effects of any general market decline affecting undamaged as well as damaged property which may occur simultaneously with a casualty," in order to ensure that the deduction is limited "to the actual loss resulting *288 from damage to the property." Section 1.165-7(a)(2)(i), Income Tax Regs. Buyer resistance attributable to general apprehension by potential buyers of recurrence of a similar casualty may not be reflected as a factor in determining the casualty loss allowable. Squirt Co. v. Commissioner,51 T.C. 543, 547 (1969); Pulvers v. Commissioner,48 T.C. 245 (1967); Thornton v. Commissioner,47 T.C. 1 (1966). The parties are in agreement as to the applicable law, and the issue before us is purely factual. Both parties have presented competent appraisals, and the authors of the documents appeared as witnesses and testified extensively at the trial. The following chart indicates the difference in the parties' estimates of the fair market value of the property in issue before and *289 after the hurricane: Petitioner
Respondent
F.M.V. BEFORE
$12,000 (A) *
LAND
$ 69,800
33,360 (B)
$ 45,360
IMPROVEMENTS
139,200
123,000
TOTAL
$209,000
168,360
F.M.V. AFTER
150,000
143,160
DIFFERENCE IN F.M.V.
BEFORE AND AFTER
59,000
25,200
Both appraisers estimated the value of the property after the hurricane, but with the physical improvements restored with insurance proceeds to their pre-hurricane condition and all debris removed. Petitioner's expert estimated the land value prior to the hurricane at $1,825 per acre; respondent's expert estimated the value at $1,200 per acre. Both experts used a series of comparables that, while the best available, are mutually conceded to be sufficiently disparate from the subject property to be of only marginal assistance. As respondent notes on brief, both appraisals contain opinions based more on the "judgment and past experience" of the appraisers than on specific comparables. He asserts that this "is due in large part to the lack of comparable sales available." After a careful review of the testimony *290 of the experts, their valuation reports, and the extensive photographs submitted by petitioners, we have concluded that petitioner's expert correctly valued the property before and after the hurricane. Petitioner's expert was thoroughly familiar with the subject property, and his appraisal was made at the time of the hurricane. He personally talked with the contractor and architect, and obtained and reviewed a set of plans making appropriate adjustments for physical depreciation. Respondent's expert viewed the subject property several years later in connection with determining whether to accept an assignment from respondent to appraise the property. It is true that respondent's expert talked to petitioner's expert and to petitioner, and did make notes at the time he visited the property. However, he was not as familiar with the property and locale as petitioner's expert, and the years that elapsed between the time of the hurricane and the time respondent's expert viewed the subject property obviously presented a handicap. And as noted, he had not at that time even made up his mind whether or not to accept respondent's offer. These disadvantages weigh heavily against respondent, *291 beginning with his valuation of the physical improvements. [4]
Respondent's expert estimated replacement costs and then adjusted for physical depreciation, and for functional and locational obsolescence. In adjusting for he used a factor called "incurable" depreciation. This was determined by taking effective age (the actual age increased or decreased for good or bad maintenance) and dividing it by economic life. In computing effective age, a term critical to this procedure, respondent's expert made the extremely serious error of assuming improvements were made to the main house in 1958 instead *292 of 1968. In fact, $52,000 in improvements to the main home were completed in March of 1969, only a few months before the furricane. Additionally, in making this calculation respondent's expert stated he considered that petitioner "might sell the property and another person won't maintain it as well." This pessimism about the solicitude of future owners is an inappropriate measuring rod of petitioner's property, and as we shall note presently, manifests an unhealthy tendency which creeps into respondent's calculations at several points. We therefore sustain petitioner's values as to the physical improvements. Additionally, the site had been extensively improved as an individual estate over a period of years, and petitioner's expert correctly concluded that the highest and best use was as an estate. The property was unique, particularly in the extensive improvements giving it a parklike quality, bot it also had extensive public road frontage, a high terrain on which the main house was located over--looking the bayou, and extensive footage fronting the bayou. Petitioner's expert, in evaluating the comparables considered, correctly made substantial adjustments in favor of the subject *293 property because the comparables often had extensive raw land, were low, swampy, had inadequate public access, or poorer terrain in relation to the bayou. We believe these adjustments entirely appropriate and accept petitioner's valuation of the land immediately before the hurricane. As noted earlier, time and circumstances impaired the ability of respondent's expert to make an evaluation as of the time of the hurricane. Additionally, we believe his methodology in evaluating the site was defective in several respects. First of all, he assumed that the highest and best use of the property would be to divide it into two parcels, retaining the main homesite and the surrounding 10 acres intact, while developing the other 27.8 acres as building sites. Despite these greatly different proposed uses of the property, respondent's expert valued the entire estate--including both parcels--at $1,200 per acre. It is difficult to see why the highest and best requires dividing the parcels for wholly disparate purposes if the per acre value of both parcels will be exactly the same. More seriously, respondent's expert unrealistically measured the damage to the two parcels. He reduced the development *294 parcel by $9,000 in value as a result of the hurricane. This $9,000 consisted solely of the value of the trees destroyed as lumber. He simply consulted a professional forester, and computed the damage on the basis of the board feet of lumber and the timber destroyed. [5] This $9,000 is wholly unrealistic. The 37.8 acres derived value from the aesthetic contribution of the trees. Undeniably petitioner had engaged in some thinning of the trees over the years, and the trees cut were sold for their value as lumber. However, this was deminimus and wholly incidental to the primary objective of maintaining the park-like quality of the estate. Therefore we find respondent's attempt to measure the damage as though petitioner were running a lumber mill to be wholly inapt. Additionally, respondent's expert estimated that the value of the improvements of the 10 acres suffered only a 10 percent decline in fair market value due to the hurricane. Respondent's expert, in arriving at this figure, notes that the typical purchaser awards *295 value to esthetic elements of a residential site. However, he felt that he should be very conservative in making an estimate for esthetic values because "even the most attractive grounds can quickly fall into a deplorable condition by neglect, and lack of proper care." This is closely related to respondent's argument on brief that the cost of maintaining an estate in the superb condition in which petitioner's estate was admittedly maintained, would be a disincentive to the average buyer. These comments overlook two critical points. First, the average buyer is not in the market for property like petitioner's. There are, however, people who want estates, and the average estate buyer would expect to maintain the property in its park-like condition. They would therefore fully expect to incur the necessary costs to maintain the features of the property making it such a desirable acquisition in the first instance. Secondly, the property was not in a deplorable condition at the time of the hurricane, but was in superb condition. The parties agree that $50,000 a year had been spent for a number of years maintaining the property in that condition. We believe this was a positive attribute *296 adding substantial value to the property, and can by no means be considered a negative element because someone might let it run down at sometime in the future. In this respect, again, respondent's expert's opinion must be discounted, while petitioner's expert was correct. Nevertheless, while we accept the before and after fair market value of petitioner's expert for the reasons stated, we find it must be adjusted in two respects. In the total casualty loss claimed petitioner included an additional $12,000 as a specific item attributable to the replacement of certain ornamental shrubbery. However, it is crystal clear that the decline in the fair market value of petitioner's property already included the loss of this ornamental shrubbery. To allow a separate specific deduction for this item would afford petitioner two deductions for the same loss. Additionally, the parties argued at great length about the portion of the decline in fair market value attributable to buyer resistance--the apprehension by prospective buyers contemplating a purchase while still suffering from the shock of nature gone awry. There was evidence that as much as 20 percent of the decline in fair market *297 value might be attributable to this phenomena. However, we believe this is high. Respondent's expert stated that "people forget so quickly" and that in his experience it is not a factor 9 months after the hurricane. Presumably, then, the factor attributable to buyer resistance could not exceed a fair interest rate for a 9-month period on the proceeds that would be realized on the sale of the property at the end of this 9-month period. For if the discount went beyond this, economic considerations would require that the sale be deferred, or a buyer would be found who was aware of the short life of buyer resistance. Additionally, respondent's expert noted that the hurricane affected nearly the whole Gulf Coast. [6] It is hard to believe that property over such a broad area would be affected by buyer resistance to anything like the extent respondent contends for. Nevertheless, we recognize that petitioner's property was probably *298 hit worse than others, and that some allowance must be made. Petitioner's expert determined that the property declined $59,000 as a result of the hurricane, after allocating (and ignoring) approximately 10 percent of the decline as being attributable to buyer resistance. We believe that the appropriate figure was between 10 and 15 percent. While hardly dealing with precisely defined quantitative criteria, we must do the best we can. Considering the entire record, with due regard to the testimony and reports of both experts, we conclude that 12 percent would have been an appropriate figure. Therefore an additional 2 percent of the decline in fair market value must be disallowed as attributable to buyer resistance. Decision will be entered under Rule 155. Footnotes
1. Twenty-thousand dollars of this casualty loss was deducted in 1970 pursuant to section 165(h). All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise indicated.↩
2. The deficiency notice asserted that this difference was $30,000. A valuation report subsequently prepared by respondent suggests that the decline in value was only $25,200, but respondent concedes that the deficiency can not be measured by less than the $30,000 decrease in value on which his deficiency notice was predicated.↩
3. In no event, however, may the amount deducted exceed the adjusted basis of the property. Sec. 1.165-7(b)(1), Income Tax Regs.; Helvering v. Owens,305 U.S. 468↩ (1939). Since respondent here does not contend that the amount petitioner seeks to deduct exceeds his adjusted basis, we will focus solely upon the issue of fair market values.
*. Respondent's expert divided the land into two parcels for valuation purposes.↩
4. The parties agree that the physical improvements were restored to their pre-hurricane condition. Nevertheless, the arboreal and terrestrial improvements are integrally related to the physical improvements, and it is the relationship of the two together that give the estate as a whole its value. Nevertheless, the parties are only $16,200 apart on the value of the physical improvements; since they are in issue only to the extent of the indirect diminution in value as a result of the devastating damage to the terrestrial improvements, this chapter of the dispute is quite minor.↩
5. He also allowed $3,000 for the value of the lumber lost as a result of the timber destroyed on the 10-acre homesite he proposed to retain intact.↩
6. He stated "[To] say that it hurt property value in the whole city [of Biloxi], you almost wouldn't do that, you know, because so much of the area was affected. You'd almost have to say, "Well, I don't want to buy any property on the Gulf Coast'."↩