JOSEPH W. TAYLOR AND REBECCA J. TAYLOR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Taylor v. Commissioner
Docket No. 2634-78.
United States Tax Court
T.C. Memo 1979-261; 1979 Tax Ct. Memo LEXIS 267; 38 T.C.M. (CCH) 1032; T.C.M. (RIA) 79261; July 11, 1979, Filed Burta Rhoads Raborn, for the petitioners. M. Alice Gresham, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined deficiencies of $6,465.48 and $454 for the taxable years 1973 and 1974, [1] respectively. The only issue for decision is the amount of a casualty loss suffered by petitioners in 1973. [2]
*268 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners were legal residents of Houston, Texas, at the time the petition was filed in this case. In September 1961, petitioners moved into a custom built home located at 146 Imperial Drive, Friendswood, Texas, in the Imperial Estates subdivision. On June 13, 1973, the home was flooded when heavy rains caused nearby creeks to overrun their banks. The property was subjected to onrushing water as well as standing water which rose to a height of approximately 14 inches inside the lower level of the two-story house. As a result of the flooding, some of the appliances and furniture were damaged. Portions of the drywall dissolved around the baseboards and some of the floor tiles curled. In addition, some of the interior paint and paneling was stained. The house also smelled for some time after the flooding, but the odor had dissipated before the home was sold in 1975. To correct this damage petitioners made the following expenditures: 1. Air conditioning motor $ 77.50
2. Washing machine motor
and bearings
47.86
3. Sheetrock
83.84
4. Paint
61.98
5. Carpentry
1,077.00
6. Overstuffed chair
225.00
7. Recliner
150.00
8. Den chair
75.00
9. Luggage
40.00
Total repairs
$1,838.18
*269 In May 1975, approximately 23 months after the flood, petitioners sold their home to Roy Wayne Singleton for $46,370. He was informed of the flooding before he purchased the property. At the time of purchase the property showed no sings of flood damage and none appeared during the 20 months he lived there. In January 1977, Mr. Singleton sold the house for $57,000. OPINION Section 165(c)(3) [3] allows a deduction to individuals for casualty losses to the extent that the amount of the loss exceeds $100. [4] The amount of the loss sustained is the lesser of the adjusted basis of the property or the difference between the fair market value of the property immediately before the casualty and its fair market value immediately thereafter. Helvering v. Owens,305 U.S. 468 (1939). The fair market values before and after the casualty "shall generally be ascertained by competent appraisal." Sec. 1.165-7 (a)(2)(i), Income Tax Regs. The loss must be limited to the actual loss resulting from the casualty without regard to any general market decline which may accompany the casualty. [5]Sec. 1.165-7(a)(2)(i), Income Tax Regs.
*270 The parties agree that any damage to the property caused by the flood is a deductible casualty loss. They disagree, however, on the amount of the loss. On March 15, 1974, petitioners retained Edgar Johnson, a professional appraiser, to assess the damage to their home. He determined that the fair market value of the home on June 1, 1973, was $51,000, and the fair market value on June 15, 1973, was $28,000, indicating a $23,000 decline in value attributable to flood damage. Petitioners contend that the appraisal was competent and should be conclusive as the the amount of the loss. Respondent contends that the relatively small amount of visible damage and the subsequent sale of the property for $18,000 more than the after casualty appraised value are proof that the appraisal was incompetent. We agree with respondent. A review of the evidence compels us to conclude that both the before and after appraisal values are unreliable. The fair market value of the residence before the casualty was determined by comparing petitioners' home to three other properties in the area [6] which were sold during 1973. The selling prices of the comparable homes were adjusted to compensate for differences *271 between petitioners' home and comparable homes, such as location, number of rooms, lot size, and marketability. [7] The following table summarizes the comparison made by Mr. Johnson: 402 Shadowbend
15338 Wandering Trail
134 Cherry Tree
Sales price
$33,700.00
$45,000.00
$37,500.00
Adjustments: Number of rooms
500.00
500.00
500.00
Square footage
1,600.00
(50.00)
1,800.00
Location desirability
2,500.00
2,500.00
2,500.00
Lot area
1,000.00
1,000.00
1,500.00
Marketability
4,500.00
2,500.00
4,000.00
Conditions of sale
4,500.00
4,000.00 *
Other
2,700.00
(200.00)
200.00
Total
$51,000.00
$51,250.00
$52,000.00
*272 The Shadowbend and Wandering Trail properties were sold prior to the flood and the Cherry Tree home was sold after the flooding. [8] Based on these three adjusted selling prices, Mr. Johnson concluded that the fair market value of petitioners' home before the flood was $51,000. We think, however, that the adjustments to the selling prices of the three houses (purportedly to reflect special attributes possessed by petitioners' house which are lacking in the comparison houses) are unsupported by the record. Mr. Johnson made substantial adjustments for such attributes as "location desirability," "conditions of sale," and "marketability," but the record does not reveal what these terms mean or how the adjustments were computed. Although it may be that a professional appraiser does not normally disclose such information in the appraisal report, we think it was incumbent on the petitioners to do so in order to carry their burden of proof on the issue. *273 The importance of verifying the propriety of these adjustments is underscored by the fact that even the most expensive of the three comparison homes still sold for $6,000 less than the appraised value of petitioners' residence. Moreover, Mr. Johnson testified that he was unable to locate any property in the comparable area that sold for more than $50,000 immediately before the flooding. Accordingly, we give little weight to the appraised value before the casualty. We think the appraised value after the flooding is even less reliable. Mr. Johnson based his estimate of the decline in value primarily on the existence of so-called "hidden damages," as evidenced by certain cracks he observed in the foundation slab and exterior brick which presumably resulted from shifting and settling of the foundation. To corroborate his testimony petitioners offered three photographs of the exterior brick taken in 1977. In only one of the photographs can some cracking be discerned and it does not appear to be serious or widespread. We fail to see how a few cracks in the slab and brick can justify a damage estimate of $23,000. Moreover, the cracking may well have taken place for reasons unrelated *274 to the flooding. It does not appreciably affect the enjoyment of the home or its appearance. More importantly, we are not persuaded that the cracking portends continuing damage to the structure caused by a shifting foundation. Our conclusion that the appraisal is incompetent is borne out by the testimony of the subsequent purchaser, Mr. Singleton. Only 23 months after the flood, and with full knowledge thereof, he paid petitioners over $18,000 more than the alleged value of the house in its damaged condition. He stated that he saw no evidence of any flood damage when he purchased the residence, nor did he notice any during the 20 months he lived there. When he sold the property in January 1977, only a few minor repairs were made to facilitate the sale. The $11,000 profit he made on the sale further substantiates his testimony regarding its condition. Thus, we think the weight of the evidence indicates that the appraisal was not "competent" as required by Sec. 1.165-7(a)(2)(i), Income Tax Regs. The appraised value of the property before the casualty is highly questionable, and there is no substantial evidence of any damage to the property beyond what was actually repaired. *275 Furthermore, we give little weight to petitioner's testimony regarding the damage because his testimony is self-serving. On the other hand, we consider Mr. Singleton's testimony to be highly persuasive. His credibility stems not only from his status as a neutral witness, but also from the fact that he invested a substantial amount of money in a home which he knew had been flooded two years earlier. We do not believe he would have done so had he any real doubts about the basic soundness of the structure. Accordingly, we conclude that petitioners are not entitled to a casualty loss deduction in excess of the cost of actual repairs less the $100 limitation. Decision will be entered for the respondent.
Footnotes
1. Respondent determined a deficiency in 1974 because petitioner elected to income average that year. Since 1973 was a base period year in the averaging computation, the 1973 deficiency necessitated a recomputation of the 1974 tax liability. ↩
2. Petitioners actually deducted a casualty loss of $24,839 on their 1973 return. This included the $23,000 decline in value per the appraisal plus $1,839 for the cost of actual repairs made to the property. Respondent allowed a deduction of only $1,738, or the cost of actual repairs less the $100 casualty loss limitation. Petitioners now contend that the actual casualty loss was $23,000.↩
3. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue, unless otherwise indicated. ↩
4. SEC. 165. LOSSES. (a) General Rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. (b) Amount of Duduction.--For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. (c) Limitation on Losses of Individuals.--In the case of an individual, the deduction under subsection (a) shall be limited to-- (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and (3) losses of property not connected wit a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. A loss described in this paragraph shall be allowed only to the extent that the amount of loss to such individual arising from each casualty, or from each theft, exceeds $100. * * * ↩
5. A temporary decline in fair market value which accompanies a casualty but is due to a drop in demand or buyer resistance is not a deductible casualty loss, even if the buyer resistance is prompted by fears of a recurrence of the casualty. Pulvers v. Commissioner,48 T.C. 245 (1967), affd. 407 F.2d 838 (9th Cir. 1969); Squirt Co. v. Commissioner,51 T.C. 543 (1969), affd. per curiam 423 F.2d 710 (9th Cir. 1970); Peterson v. Commissioner,30 T.C. 660↩ (1958). In the present case petitioners contend that the entire $23,000 casualty loss was a result of actual damage to the property, not a temporary fluctuation in value created by a slack market.
6. At least two of the comparables were not located in the Imperial Estates subdivision, but a map of the city shows that all three homes were located within two miles of petitioners' residence. ↩
7. The record is not clear as to what "marketability" means. Respondent's brief indicates that it refers to the effect of the method of financing on saleability, but there is nothing in the record which would indicate what method of financing could or would have been used in connection with the sale of petitioners' property.↩
*. The appraisal indicates only a $400 adjudgment for conditions of sale, but that is apparently a typographical error.↩
8. Mr. Johnson testified that the Cherry Tree residence was also flooded, but te record discloses neither the extent of the damage nor repairs made prior to the sale, if any.↩