DONALD STRUTZ AND NATALIE J. STRUTZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Strutz v. Commissioner
Docket No. 12889-78.
United States Tax Court
T.C. Memo 1980-274; 1980 Tax Ct. Memo LEXIS 311; 40 T.C.M. (CCH) 757; T.C.M. (RIA) 80274; July 28, 1980, Filed Michael R. McCanna, for the petitioners. Robert R. Rubin, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined a deficiency of $4,644.81 in petitioners' 1973 Federal income tax. By an amended answer respondent increased the claimed deficiency to $7,898.20. Petitioners, by an amended petition, claim an overpayment of tax based upon an increase in a casualty loss deduction over the amount claimed on the 1973 return. Respondent having thereafter on brief conceded a casualty loss in the amount of $5,550, the sole issue for decision is the actual amount of such loss under section 165(c)(3). [1]
*313 FINDIGS OF FACT Some of the facts have been stipulated and are so found. At the time of filing this petition herein, petitioners resided in Wisconsin. The property in question is a "year-round" house on Whitefish Bay, located on the Wisconsin shore of lake Michigan. Whitefish Bay is approximately 12 miles from Sturgeon Bay, Wisconsin. The nearest settlement is one-half mile from the property in question and has a population of about 50.During 1973 the property was used by the taxpayer for recreational purposes and was not held for business or investment purposes. The approximate dimentions of the property are 185 by 250-300 feet. Petitioners bought the unimproved lot in 1966 and built their house in 1967. The house is an attractive 3-bedroom, 2-bathroom structure, the construction of which may be described as "good to custom." Its general appearance is appropriate for a shore house and the site upon which it is located. The living room features a stove, corner fireplace and beamed ceilings with panelled walls and large glass doors across the front, which faces Lake Michigan. The house is located on a slight rise, from which, before the storm in question, the terrain *314 undulated rather gently down to the lake. The physical structure of the house was not damaged by the storm hereinafter referred to. Before the storm there existed, between the rise upon which the house is situated and the lake, a knoll, or "berm", approximately 5 feet high and 25 feet across, which was thickly vegetated with sawgrass and which served as a natural protecting barrier between the house and the lake against wave action from the lake and the possibility of the meandering of Whitefish Bay Creek from the south. Sawgrass grows naturally and is virtually impossible to transplant. Before the storm, the front of the house was approximately 160 feet from the water line. The devastating storm which partially destroyed petitioners' beach occurred on April 9, 1973. Petitioners' property is in the area which suffered the most damage as a result of the storm. It destroyed the berm which protected the house and approximately 55 feet of beach depth. As a result of the loss of the berm as anatural barrier, petitioners were required to erect an unsightly artificial barrier in the form of a sea wall stretching 150 feet across the front or width of the property, at a cost of *315 $4,035.08. At the time of the trial of this case petitioners had the only sea wall on Whitefish Bay. One effect of the destruction of the berm may prove to be the meandering of Whitefish Bay Creek north toward petitioners' property, thereby undermining their sea wall. The adjusted basis of petitioners' property as of the date of the storm was $34,576.36, $10,000 of which was attributable to the land. Petitioners received no insurance as a result of the damage to their property by the storm. OPINION The sole issue for decision is the amount of the casualty loss deduction to which petitioners are entitled under section 165(c)(3) as a result of storm damage to their Lake Michigan property on April 9, 1973, respondent having agreed that the loss qualifies as a casualty loss under that section. [2]
*316 By an amended petition allowed by the Court and filed by petitioners after completion of the trial to conform the pleadings to the evidence, Rule 41(b), Tax Court Rules of Practice and Procedure, petitioners allege that the claimed casualty loss of $22,900 should be increased by $4,035.08, the cost of a sea wall erected by petitioners. In his deficiency notice respondent originally allowed a casualty loss to the extent of $8,850, thus disallowing $14,050 of the loss initially claimed by petitioners. By amended answer filed before the commencement of the trial, respondent alleged that the correct amount of the loss was $1,100, [3] thereby increasing the asserted deficiency from $4,644.81 to $7,898.20. In his moving papers respondent alleged that the original deficiency was based upon an appraisal by Richard J. Bourguignon, who died before the trial, and that the proposed increased deficiency was based upon an "Engineering and Valuation Report" by an I.R.S. Valuation Engineer. In his Brief in Answer respondent states that "[after] considering all the facts respondent concedes that the loss is greater than $1,200 and includes the cost of the sea wall"; he now requests that we *317 find as an ultimate fact the amount of petitioners' deductible casualty loss is $5,550. The regulations provide that the amount deductible as a casualty loss is the lesser of the amount which is equal to the fair market value of the property immediately before the casualty reduced by the fair market value of the property immediately after the casualty; or, the adjusted basis determined under section 1.1011-1 of the regulations. [4]
*318 The regulations further provide, in section 1.165-7(b)(2)(ii), that in determining a casualty loss involving real property and improvements thereon not used in a trade or business or in any transaction entered into for profit, "no separate basis need be apportioned to such improvements." We have found as a fact that petitioners' property was neither business nor investment property. Accordingly, we interpret this regulation to mean that the only basis limitation in this case is the stipulated $34,576.35 basis for the entire property, notwithstanding the fact that the only physical damage was to the land, the basis of which was $10,000. This is appropriate because the amount to be determined here is the reduction in the fair market value of the entire property, not just the fair market value of the land. The regulations also specify the method of valuation. Section 1.165-7(a)(2)(i) provides that fair market value before and after the casualty "shall generally be ascertained by competent appraisal." Section 1.165-7(a)(2)(ii) provides that the cost of repairs is acceptable as evidence of the loss of value. [5]
*319 In order to support their claimed deduction, petitioners obtained written statements as to loss of value resulting from the storm damage from two local licensed real real estate brokers, each of whom has had many years of experience in buying and selling property in Door County, Wisconsin, where petitioners' property is located. Virgil H. Starr, at the time of the trial of this case, had been a licensed real estate broker for 19 years and had lived and worked in sturgeon Bay, near Whitefish Bay, for his entire life. In his appraisal he stated that the storm damage to petitioners' property reduced its value by at least $23,000. Starr has been engaged in the sale and appraisal of shoreline property in the Lake Michigan-Sturgeon Bay and Whitefish Bay area during his entire practice and his testimony reflected a detailed familiarity with lakefront property generally and the petitioners' property in particular. Starr testified that the fair market value of petitioners' property prior to the storm was $62,000, and after the storm, $39,000. He used the market approach. He measured the building at 1200 square feet and calculated replacement costs at $25.00 a square foot and thus *320 reached a value of $30,000 for improvements. Starr did not take depreciation or add appreciation, although he felt the building had actually appreciated in value.He calculated the value of the land as follows: He determined the the taxed amount ($175 per square foot) and multiplied by the frontage feet (195). The land was thus valued at $34,125. Thus, the fair market value of the property prior to the casualty was $64,125. Being familiar with the assessment procedures during the subject years and feeling the land may have been slightly over-assessed at $175 per frontage foot, Starr rounded the figure off to $62,000. The storm did not diminish the amount of frontage feet on the property; nor was the building invaded by the flood. The loss was of approximately 55 feet of beach depth depth and a permanent, protective and aesthetic berm which stretched across the property, 5 feet high and 25 feet wide. Keeping the above values in mind Starr estimated a loss of approximately 35 percent. This was based on his knowledge of the area, his knowledge of the requirements of buyers of shoreline property, his recognition of the permanent damage involved and his experience in this very *321 specific market. With respect to comparables, Starr testified that the extent and nature of the damage to petitioners' property, including the damage to the involved berm, precluded the finding of comparables. Testifying from a map of the area published by the local real estate board, Starr rated real estate north along the shore from Sturgeon Bay, to and including petitioners' property, as between "A", the lowest rating, and "AAAA", the highest rating. Petitioners' property is rated AAAA. He demonstrated detailed knowledge of the development, accessibility, aesthetics and quality of the beach in each of these classifications. Starr referred to the area in which petitioners' property was located as the "Gold Coast" in terms of the quality of the beach and the improvements in the area. In arriving at his opinion Starr took into account both the loss of depth of the lot and the loss of the protective knoll, or "berm", which before the storm had served as a protective buffer against erosion from wave action on Lake Michigan. Starr described the sea wall, which petitioners were required to construct to replace the natural barrier previously provided by the destroyed berm, as *322 a degradation to the property and a potential hazard. He stated that potential purchasers of lake shore property in Door County are looking for aesthetics and large sand beaches, which, in the case of petitioners' property, were substantially reduced as a result of the storm damage.
Petitioners also relied upon the expert opinion of Karl S. May, also an experienced licensed real estate broker and appraiser of Door County. May's appraisal was dated December 27, 1976, and was thus made substantially after the date of the storm damage in 1973. May's opinion of the diminution in fair market value as a result of the storm was $19,000. He used a modified cost approach, determining land value prior to the storm as $27,750 (185 frontage feet x $150 per front foot). Improvements were valued at $24,024 (1092 square feet x $22 per square foot replacement cost; adding $1500 for the fireplace and $3500 for the well, septic system and sauna). To the total value of $29,024, May applied a five percent depreciation, suggesting a useful life of 40 years. The building's final value was estimated at $27,573. The entire property was thus valued at $55,323, rounded to $55,000.May had had extensive *323 experience in sales and appraisals in the Door County area. He is presumably personally aware of what buyers are looking for on the Door County shoreline. His appraisal is dated circa the casualty at issue.Like Starr, May could find no comparables, given the nature and extent of the damage involved. Based on his experience in the area, his knowledge of the property before the storm and the above figures, he estimated the diminution to be $19,000--$4,000 less than Starr's figure, but $17,800 more than the Commissioner's allowance. May testified that, while his written report was submitted before he knew anything about the substance of the report of Dr. Ronald Tank, infra, nevertheless nothing in Dr. Tank's report adversely affected the opinion rendered in his (May's) written report or oral testimony. It follows from this, then, that May took into consideration the loss of the berm and the cost of trying to replace its barrier effect by means of a sea wall. Petitioners produced Dr. Ronald Tank, a geologist and sedimentologist from Lawrence University, Appleton, Wisconsin, to testify regarding the loss of the berm. Dr. Tank, who was personally familiar with the locality (having, *324 among other things, fished in Whitefish Bay Creek as a boy), testified that before the storm the berm ran across petitioners' property and 570 feet south to the mouth of Whitefish Bay Creek. In his opinion, the destruction of the berm will permit the creek to meander north past the petitioners' sea wall with the effect of further erosion. He also testified that, in addition to protecting the property from the meandering creek the berm also protected the petitioners' property from high water wave action. He stated that in his opinion the loss of the protection afforded by the berm was permanent. We find Dr. Tank well qualified to testify on the matters as to which his testimony was adduced and we find his testimony credible. As noted, the destroyed berm not only stretched across petitioners' frontage but also extended 570 feet southward to the creek. The sea wall, on the other hand, was only on petitioners' property. Thus, while the sea wall may or may not protect the property from wave action, it probably will not protect it from erosion caused by the meandering creek. Therefore, the "repair", in terms of the sea wall, did not adequately replace the destroyed natural barrier *325 afforded by the berm. Respondent's expert was an appraiser with the Internal Revenue Service, located in Milwaukee. As of the time of the trial he had mainly appraised property located in the Milwaukee area. He had appraised approximately 30 casualty damaged cases. While such experience is impressive insofar as it reflects experience with casualty losses in general, respondent's expert conceded that he had had no experience with regard to property values in the specific geographic locality with which we are here concerned; i.e., Door County and Sturgeon Bay-Whitefish Bay. Respondent's expert displayed substantial and impressive familiarity with the theory and procedures of real estate appraisal, and in fact he testified that he had rewritten the appraisal text for estate and gift tax attorneys for the Internal Revenue Service. Nevertheless, respondent's expert testimony suffers the fatal defect of having to substitute arithmetical calculations for actual on-the-scene experience. It is true that respondent's expert valued the lot by using comparable sales of unimproved property, but from that point on his determination of loss of value was purely mechnical. As indicated previously, *326 respondent asserted in his amended answer that petitioners' casualty loss was limited to $1,200. In a nutshell, the basis for this position is stated in the following colloquy between respondent's counsel and his expert witness: Mr. rubin/: So basically, you calculated that approximately 6% of the land was lost as a result of the storm and you multiplied 6% times your land value of $20,000.00 and arrived at a diminution of -- in value of $1,200.00? A: That's correct. This testimony was also somehow based upon a "depth chart" obtained from the Wisconsin 1975 Assessment Manual, volume 1, which purports to show the effect of depth on valuation. Suffice it to say that, insofar as this record indicates (conceding arguendo that such data, if properly explained, might be useful as a guide in appropriate situations), no distinction whatever is made in respondent's application of the depth chart between lakefront property, suburban property, city property or, in the case of the specific lot in question, between the front of the lot, which includes the beach, and the back of the lot, which abuts the road. Respondent none-theless adheres to his position, notwithstanding impressive *327 evidence to the contrary at the trial, except for his concession that the cost of the sea wall may be included in petitioners' deductible loss. For the reasons stated, we find the testimony of respondent's witness in this case lacking significant probative value. Over and above his expert's testimony that the actual loss sustained was minimal, respondent also maintains that petitioners' loss was temporary, that it resulted from the rising and falling lake level which should be viewed as a "succession of adverse or favorable developments" which do not give rise to tax adjustments, and that if there was a diminution in market value it was due to fear to future loss. Respondent cites a number of cases for support including, Citizens Bank of Weston v. Commissioner, 28 T.C. 717 (1957), affd. 252 F.2d 425 (4th Cir. 1958); Squirt v. Commissioner, 51 T.C. 543 (1969), affd. percuriam423 F.2d 710 (9th Cir. 1970); Pulvers v. Commissioner, 48 T.C. 245 (1967); affd. percuriam, 407 F.2d 838 (9th Cir. 1969); and Thornton v. Commissioner, 47 T.C. 1 (1966). Unfortunately *328 for respondent's case, none of the cases which he cites is apposite to the situation before us. In Citizens Bank of Weston, this Court found that the Bank's voluntary relinquishment of a part of its premises was "merely a present non-use" due to the Bank's fear that there might be future flooding. In Pulvers, there was no physical damage to taxpayer's property; his entire claim was based on fear of future damage. Thornton involved loss to "relatively modest [and unproved] flood damage" to carpets and linoleum. Squirt stands for the proposition that a casualty loss will not be deducted for decline in market value effected by damage to surrounding territory. Respondent has offered no evidence to rebut petitioners' evidence that the loss in value was not due to these factors. In this case it is apparent that petitioners' physical loss consists basically of two elements: the loss of approximately 55 feet of beach depth and the loss of the natural berm as a natural barrier against high-wave damage and possible erosion from Whitefish Bay Creek. Petitioners have drawn our attention to, and based their claim for overpayment on, our decision in Tatham v. Commissioner, *329 T.C.M. 1979-205, a case involving a strikingly similar fact pattern. Since the facts in Tatham are so similar, the case merits some discussion here. In Tatham, a licensed real estate agent testified as to the loss of value to the taxpayer's Lake Michigan shore property resulting from storm damage, and we accepted the agent's testimony as establishing the taxpayer's deductible loss. After viewing the property, her estimate of the property's decline in value was based upon two components: the cost of repairing the actual damage and the loss of the natural sand beach. In the case before us, both brokers who testified for petitioners stated that they took the loss of the berm into account in reaching their respective opinions. Accordingly, it would be inappropriate for us to allow the deduction of the cost of the sea wall; i.e., the cost of repair, in addition to the brokers' estimate of loss which included the cost of repair, and since we are unwilling to allow a deduction greater than the amount of loss to which petitioners' own witnesses testified, petitioners' claim of overpayment accordingly must be denied. In any event, we found Starr's testimony in particular *330 to have been knowledgeable, forthright and credible. His knowledge of the real estate market in the Sturgeon Bay-Whitefish Bay locale was extensive. Having rejected respondent's evidence on value, we conclude that Starr's appraisal of the decline in value in the amount of $23,000 was correct, and we accept it (to be reduced, of course, by the $100 section 165(c)(3) "deductible").
One final word. Respondent, in his Motion for Leave to File Amendment to Answer, stated that the deficiency originally asserted in the amount of $4,644.81 was based upon an appraisal made by Richard J. Bourguignon, who died before the trial. Starr, petitioners' witness, testified that Mr. Bourguignon had a very favorable reputation as an appraiser. This case at most involved respondent's amended deficiency of $7,750 plus the small overpayment claimed by petitioners, yet the trial entailed the lengthy testimony of Mr. Strutz and four expert witnesses, consumed over 10 hours of trial time and produced a recorded transcript 372 pages long. While Mr. Bourguignon's appraisal is not before the Court and we have no way of evaluating it except to the extent just noted, it was available to the parties as *331 were Starr's and Mays' reports at a time when the asserted deficiency was only $4,644.81. Surely these reports must have afforded a reasonable basis of compromise so as to obviate such an excessive expenditure of time, effort and money as proved to be necessary in trying this case. We recently had this to say of a valuation case awaiting trial: We are convinced that the valuation issue is capable of resolution by the parties themselves through an agreement which will reflect a compromise Solomon-like adjustment, thereby saving the expenditure of time, effort, and money by the parties and the Court -- a process not likely to produce a better result. Indeed, each of the parties should keep in mind that, in the final analysis, the Court may find the evidence of valuation by one of the parties sufficiently more convincing than that of the other party, so that the final result will produce a significant financial defeat for one or the other rather than a middle-of-the-road compromise which we suspect each of the parties expects the Court to reach. If the parties insist on our valuing any or all of the assets, we will. We do not intend to avoid our responsibilities but instead seek *332 to administer to them more efficiently -- a factor which has become increasingly important in light of the constantly expanding workload of the Court. Buffalo Tool and Die Manufacturing Co., Inc. v. Commissioner, 74 T.C.     (No. 31) (5/27/80). (Emphasis added.) Suffice it to say that the wisdom of these words has now been demonstrated. Decision will be entered for petitioners. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the year in issue.↩
2. Section 165(c) provides in pertinent part as follows: (c) LIMITATION ON LOSSES OF INDIVIDUALS--In the case of an individual, the deduction under subsection (a) shall be limited to-- * * * (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. A loss described in this paragraph shall be allowed only to the extent that the amount of loss to such individual arising from each casualty, or from each theft, exceeds $100.For purposes of the $100 limitation of the preceding sentence, a husband and wife making a joint return under section 6013 for the taxable year in which the loss is allowed as a deduction shall be treated as one individual. No loss described in this paragraph shall be allowed if, at the time of filing the return, such loss has been claimed for estate tax purposes in the estate tax return.↩
3. Presumably $1,200 less the $100 statutory reduction referred to in fn. 2.↩
4. Section 1.165-7(b)(i), Income Tax Regs., reads in pertinent part as follows: (b) Amount deductible. (1) General rule. In the case of any casualty loss whether or not incurred in a trade or business or in any transaction entered into for profit, the amount of loss to be taken into account for the purposes of section 165(a) shall be the lesser of either-- (i) The amount which is equal to the fair market value of the property immediately before the casualty reduced by the fair market value of the property immediately after the casualty; or (ii) The amount of the adjusted basis prescribed in § 1.1011-1 for determining the loss from the sale or other disposition of the property involved. Section 1.1011-1 of the Income Tax Regs., reads as follows: Sec. 1.1011-1 Adjusted basis. The adjusted basis for determining the gain or loss from the sale or other disposition of property is the cost or other basis prescribed in section 1012 or other applicable provisions of subtitle A of the Code, adjusted to the extent provided in sections 1016, 1017, and 1018 or as otherwise specifically provided for under applicable provisions of internal revenue laws.↩
5. Section 1.165-7(a)(2), Income Tax Regs. provides as follows: Sec. 1.165-7 Casualty losses. * * * (2) Method of valuation. (i) In determining the amount of loss deductible under this section, the fair market value of the property immediately before and immediately after the casualty shall generally be ascertained by competent appraisal. This appraisal must recognize the effects of any general market decline affecting undamaged as well as damaged property which may occur simultaneously with the casualty, in order that any deduction under this section shall be limited to the actual loss resulting from damage to the property. (ii) The cost of repairs to the property damaged is acceptable as evidence of the loss of value if the taxpayer shows that (a) the repairs are necessary to restore the property to its condition immediately before the casualty, (b) the amount spent for such repairs is not excessive, (c) the repairs do not care for more than the damage suffered, and (d) the value of the property after the repairs does not as a result of the repairs exceed the value of the property immediately before the casualty.↩