SQUIRT COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4212–67.   Filed January 6, 1969.

*Albert J. Galen*, for the petitioner.
*Ralph V. Bradbury, Jr.*, for the respondent.

TIETJENS, *Judge:* The Commissioner determined a deficiency in petitioner's income tax for the taxable year ending December 31, 1962, in the amount of $48,863.10.

Due to the concessions that have been made, the only issue is whether petitioner suffered a casualty loss to its land and, if so, the amount deductible under section 165, I.R.C. 1954.[1]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation and exhibits attached thereto are incorporated herein by this reference.

Petitioner, the Squirt Co., was organized as a corporation in 1946, from a prior-existing partnership. At the time the petition herein was filed, petitioner's principal place of business was located in Sherman Oaks, Calif.

Petitioner has been and still is in the business of producing a grapefruit-flavored soft-drink syrup concentrate, which is manufactured from fresh grapefruit, and selling it to franchised bottlers throughout the United States and several foreign countries. The syrup is then used by its franchised dealers in making a beverage sold under the name of Squirt.

---

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise specified.

In 1958, petitioner purchased for $440,000 a citrus ranch located 3 miles east and ½ mile south of Raymondville, Willacy County, Tex., in what is known as the Rio Grande Valley section of Texas. The ranch consisted of 493.39 acres, containing 13 blocks of approximately 40 acres each. Each of the 13 blocks was contiguous to a paved farm road.

The dominant soil on the petitioner's citrus ranch is "Willacy fine sandy loam," a good citrus soil. This type of soil goes to depths of up to 6 feet. The topsoil ranges from around 12 inches to 18 inches deep. However, there is no real difference between the topsoil and the soil immediately thereunder insofar as growing citrus trees is concerned.

On January 1, 1962, there were 354 acres of the ranch devoted to citrus groves, 230 of these acres contained citrus trees approximately 30 years old, the other 124 acres of citrus trees were planted in 1960 and 1961.

The Rio Grande Valley had suffered from freezes in 1949, 1951, and 1957. During January 1962, the Rio Grande Valley experienced unseasonably low temperatures down to 14 degrees. As a result of this freeze, petitioner's 230 acres of 30-year-old trees were destroyed. Accordingly, during the calendar year 1962, petitioner was forced to remove all the old citrus trees and debris from these 230 acres. Petitioner also leveled and terraced the land, putting these acres in better condition than they were prior to the January 1962 freeze. Petitioner decided to do this work as it was the practice to do so under these circumstances.

The freeze did no physical damage to the soil. Neither the productivity nor the useful life of the 354 acres of soil was reduced by the freeze.

The total cost of clearing the citrus trees on the 230 acres, disposing of all the debris, and leveling and terracing the land after the casualty was approximately $60 per acre or $13,800. Of this cost $8,200 was deducted in the petitioner's 1962 income tax return as depreciation expense labeled on the depreciation schedule as "Removal Old Groves." The balance of the cost incurred in 1962 was absorbed in the regular operating expense accounts of the petitioner. Of this amount the Commissioner allowed as a casualty loss to the land, $40 per acre or $9,200 as the cost of removing the dead or damaged trees and leveling or terracing.

With respect to the additional 124 acres, the January 1962 freeze damaged but did not destroy these citrus trees planted in 1960 and 1961. At the time of the commencement of the freeze these trees were banked or hilled up with soil. The freeze killed the trees only down to the bank. After warm weather arrived, the banks were removed and

the trees were pruned. Thereafter, most of these trees put out good growth and recovered from the freeze. Those few trees that did not recover were removed, the expense of which was absorbed in the year of removal in the regular operating expense accounts of the petitioner.

There have been fluctuations in the price of citrus land in the Rio Grande Valley in recent years. Subsequent to the freeze, there was a substantial reduction in the fair market value of petitioner's citrus tree land.

The petitioner employed an appraiser during 1962 to make a detailed inspection of the property following the freeze and to determine the damage to the property following the freeze. In 1967 the appraiser subsequently reviewed his appraisal of the loss taking into consideration the diminution in values which resulted immediately following the freeze in January 1962.

A summary of the appraiser's findings is as follows:

| Block No. | Acres | Fair market value reduction | Reduction per acre |
|---|---|---|---|
| 3 | 17 | $3,400 | $200 |
| 4 | 5 | 1,000 | 200 |
| 5 | 8 | 1,600 | 200 |
| 6 | 18 | 3,600 | 200 |
| 6 & 11 | 25 | 2,500 | 100 |
| 11 | 30 | 1,500 | 50 |
| 10 | 15 | 2,250 | 150 |
| 12 | 39 | 7,800 | 200 |
| 13 | 40 | 8,000 | 200 |
| 14 | 36 | 7,200 | 200 |
| 15 | 25 | 5,000 | 200 |
| 19 | 42 | 8,400 | 200 |
| 20 | 39 | 1,950 | 50 |
| Total | | 54,200 | |

The appraiser's reduction of fair market value was based on the general market decline for land in this area on account of freeze, in addition to the estimated cost of putting the land back into usable condition. In addition to the losses reflected on the foregoing summary, the appraiser increased the loss by the amount of $7,800 representing the loss of use of land which would have been taken into consideration by a buyer of the land. Thus, the total reduction in fair market value of the land was computed to be $62,000, which we accept.

On December 31, 1961, the petitioner's basis in the 493.39 acres of ranch land was $153,013.75; while on the same date, petitioner's adjusted basis for the citrus trees on the 354 acres of land was $57,273.62.

Petitioner claimed a casualty loss in the amount of $130,125 on its 1962 Federal income tax return, of which amount $94,684.15 was claimed as a casualty loss to the orchard land and $35,440.85 was claimed as a casualty loss to the citrus trees. The Commissioner disputed this deduction, but subsequently allowed as a casualty loss under

section 165, $57,273.62 for the loss of the citrus trees and a $9,200 deduction for the cost of clearing the land.[2]

OPINION

The Commissioner has allowed as a deduction in computing petitioner's casualty loss, petitioner's total adjusted basis in the destroyed citrus trees ($57,273.62) plus the cost of clearing the land of the dead or damaged trees ($9,200). Thus, the sole question now is whether petitioner is entitled to any additional deductions under section 165(a),[3] and if so, the amount.

We have found that there was a $62,000 decline in fair market value of the land, $52,800 greater than the deduction permitted by the Commissioner. The decline in value of $52,800 was attributable to reasons other than the cost of clearing the debris from the land. This is true because had this not been the case, the fair market value of the land after the freeze would have been the value of the land prior to the freeze less the cost of clearing the land of the trees. As the land was not otherwise physically damaged, we accept as fact the testimony of petitioner's witness who testified that the decline in value in the amount of $45,000 was due to a general reduction in value of citrus tree land in this area (i.e., buyer resistance probably triggered by the feeling that there having been one such freeze there would be others and a change in crop emphasis) and the additional $7,800 was a temporary reduction in value due to loss of the use of the land during the period of rehabilitation.

Petitioner's argument is based upon the following language from section 1.165–7(a)(2)(i), Income Tax Regs.:

*Method of valuation.* (i) In determining the amount of loss deductible under this section, the fair market value of the property immediately before and immediately after the casualty shall generally be ascertained by competent appraisal.

Petitioner asserts it has adequately proven the fair market value of the land before and after the casualty and that this net decrease is deductible in total as a casualty loss under section 165(c).

For additional support, petitioner relies upon *Bessie Knapp,* 23 T.C. 716, 721 (1955), wherein we found that where the fair market value of citrus tree land decreases due to a freeze and "such variance in values was attributable to the cost of removing dead citrus trees" then "such * * * decrease in value is a casualty loss."

---

[2] This cost also included the cost of filling the holes that resulted from the removal of the trees.

[3] SEC. 165. LOSSES.

(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

It is apparent that petitioner's reliance upon *Knapp* is misplaced. True in *Knapp* the reduction in fair market value of citrus tree land was used to *measure* the amount of loss. However, in that case the decrease in market value represented only the cost of removing dead trees from the land and we allowed this amount as the measure of the casualty loss. See sec. 1.165–7(a)(2)(ii)[4] Income Tax Regs.

Under the facts herein, the Commissioner has already allowed the repair costs of $9,200 in computing the casualty loss.[5] The additional decrease in value of $45,000 represents a decline not due to actual physical damage to the land but rather because of the decline in demand for citrus land in the area of Texas. The decline in demand that caused the decrease in market value may have been the result, in part, of the freeze. However, this reduction in market value is not a loss of the character deductible under the casualty loss provisions of section 165. See *Harvey Pulvers*, 48 T.C. 245 (1967); *Joe B. Thornton*, 47 T.C. 1 (1966); *Clarence A. Peterson*, 30 T.C. 660 (1958).

Not all reductions in market value resulting from casualty-type occurrences are deductible under section 165; only those losses are deductible which are the result of actual physical damage to the property. Only in such circumstances is the yardstick of market value used to measure the loss. This reasoning is borne out by the Commissioner's regulations that state:

Sec. 1.165–7(a)(2). *Method of valuation.* (i) In determining the amount of loss deductible under this section, the fair market value of the property immediately before and immediately after the casualty shall generally be ascertained by competent appraisal. This appraisal must recognize the effects of any general market decline affecting undamaged as well as damaged property which may occur simultaneously with the casualty, in order that any deduction under *this section shall be limited to the actual loss resulting from damage to the property.* [Emphasis supplied.]

It is clear from the emphasized phrase above that *only* the amount of the loss resulting from physical damage to property is deductible under this section. Here the land itself was not physically damaged. The additional decrease in the value of the land ($45,000) was due to a "general market decline" that occurred "simultaneously with the casualty" and affected "undamaged as well as damaged property." Ac-

---

[4] Sec. 1.165–7 Casualty losses.

(ii) The cost of repairs to the property damaged is acceptable as evidence of the loss of value if the taxpayer shows that (a) the repairs are necessary to restore the property to its condition immediately before the casualty, (b) the amount spent for such repairs is not excessive, (c) the repairs do not care for more than the damage suffered, and (d) the value of the property after the repairs does not as a result of the repairs exceed the value of the property immediately before the casualty.

[5] The Commissioner asserted, and the petitioner failed to deny, that $20 per acre represented the additional estimated cost of leveling and terracing the land, a cost for a repair that would put the land in better condition than it was prior to the freeze. As such, under sec. 1.165–7(a)(2)(ii), this would not be a deductible loss, but rather a capital expenditure.

cordingly, we find petitioner may not deduct this amount as a loss under section 165(a).

The additional $7,800 claimed represents a temporary reduction in value due to the loss of the use of the land during its period of rehabilitation. This constitutes the loss of future profits and is also not deductible under section 165(a). The same type of loss was claimed in *J. G. Boswell Co.*, 34 T.C. 539 (1960), wherein we answered the contention at page 545:

> It is vital to a loss that something of value be parted with, i.e., the petitioner must have suffered a "loss" in the economic sense. Bookkeeping entries and paper losses are not sufficient. Cf. *A. Giurlani & Bro.* v. *Commissioner*, 119 F. 2d 852, 857 (C.A. 9), affirming 41 B.T.A. 403.
>
> In support of its claim petitioner points to the loss of income from the flooded lands.
>
> The Code contemplates only a loss of capital, or, in other words, actual loss of tangible or measurable property. This does not encompass a failure of profits or the loss of potential income. *Hort* v. *Commissioner*, 313 U.S. 28. The respondent was correct in disallowing the loss insofar as it was based on loss of profits.

For the reasons stated above,

*Decision will be entered for the Commissioner.*