T.C. Memo. 2000-33

UNITED STATES TAX COURT

GERALD CHAMALES AND KATHLEEN CHAMALES, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14839-98.              Filed February 3, 2000.

In 1994, Ps contracted to purchase a home located
in the Brentwood Park area of Los Angeles, California,
adjacent to the residence owned by O.J. Simpson.
Shortly thereafter, Nicole Brown Simpson and Ronald
Goldman were murdered, and O.J. Simpson was arrested in
connection therewith. The neighborhood surrounding the
Simpson property became inundated with media personnel
and so-called looky-loos (celebrity-enthralled
sightseers), and this unprecedented attention continued
for many months. On their 1994 Federal income tax
return, Ps took the position that these events
constituted a casualty which permanently devalued their
property and for which they were entitled to a sec.
165(c)(3), I.R.C., casualty loss deduction. R
disallowed the deduction and also determined a sec.
6662(a), I.R.C., accuracy-related penalty on account of
negligence.

Held:  Ps are not entitled to a casualty loss deduction for fluctuation in the market value of their property and are liable for the deficiency determined by R.

Held, further, Ps are not liable for the sec. 6662(a), I.R.C., accuracy-related penalty on the grounds that the deduction claimed was taken with reasonable cause and in good faith.

Bruce I. Hochman, Dennis L. Perez, and Stuart A. Simon, for petitioners.

Michele F. Leichtman and Jason M. Silver, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

NIMS, Judge:  Respondent determined a Federal income tax deficiency for petitioners' 1994 taxable year in the amount of $291,931.  Respondent also determined an accuracy-related penalty of $58,386 for 1994, pursuant to section 6662(a).

The issues for decision are as follows:

(1) Whether petitioners are entitled to deduct a net casualty loss of $751,427 for the taxable year 1994; and

(2) whether petitioners are liable for the section 6662(a) accuracy-related penalty on account of negligence.

Unless otherwise indicated, all section references are to sections of the Internal Revenue Code (Code) in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of the parties, with accompanying exhibits, are incorporated herein by this reference.

Gerald and Kathleen Chamales (petitioners) are married and resided in Los Angeles, California, at the time of filing their petition in this case. In the spring of 1994, petitioners became interested in purchasing a residence in Brentwood Park, an exclusive Los Angeles neighborhood. They were attracted to the beautiful, parklike setting and the quiet peacefulness of the area. Subsequently, on June 2, 1994, petitioners opened escrow on property located in Brentwood Park, at 359 North Bristol Avenue. They were represented in this transaction by Jay Solton (Solton), a real estate agent with more than 20 years of experience. Solton's work focused on sales of properties in the Westwood, Brentwood, Palisades, and Santa Monica areas of Los Angeles.

At the time petitioners opened escrow, O.J. Simpson (Simpson) owned and resided at the property located directly west of and adjacent to that being purchased by petitioners. Simpson's address was 360 North Rockingham Avenue. Both parcels were corner lots, bounded on the north by Ashford Street. The rear or westerly side of petitioners' land abutted the rear or easterly side of the Simpson property.

During the escrow period, on June 12, 1994, Nicole Brown
Simpson and Ronald Goldman were murdered at Ms. Brown Simpson's
condominium in West Los Angeles.  Simpson was arrested for these
murders shortly thereafter.  Following the homicides and arrest,
the Brentwood Park neighborhood surrounding the Simpson property
became inundated with media personnel and equipment and with
individuals drawn by the area's connection to the horrific
events.  The media and looky-loos[1] blocked streets, trespassed on
neighboring residential property, and flew overhead in
helicopters in their attempts to get close to the Simpson home.
Police were summoned to the area for purposes of controlling the
crowds, and barricades were installed at various Brentwood Park
intersections to restrict traffic.  This police presence,
however, had little practical effect.  Significant media and
public attention continued throughout 1994 and 1995.  Although
Simpson was acquitted on October 4, 1995, civil proceedings in
1996 reignited public interest.

Petitioners closed escrow on June 29, 1994, purchasing the
residence on North Bristol Avenue for $2,849,000.  Petitioners

---

[1] As explained by petitioners' counsel, "looky-loo" is a
term developed in Hollywood to describe individuals who gather at
places and events in hopes of glimpsing celebrities.  The phrase
is apparently used in California to denote those who frequent a
location not because of its status as a conventional tourist
sight but because of its association with a famous or notorious
person.  We adopt the terminology and spelling as used in
petitioners' briefs and by the witnesses at trial.

had considered canceling the escrow and had discussed this possibility with their attorney, but upon being advised that liability would result from a cancellation, they decided to go through with the transaction. Later that summer, as the crowds and disruption persisted, Gerald Chamales (petitioner) inquired of his broker Solton whether the value of his property had declined. Solton indicated that she estimated a decrease in value of 20 to 30 percent.

Petitioners' 1994 tax return was prepared by Ruben Kitay (Kitay), a certified public accountant. In the course of preparing this return, Kitay and petitioner discussed the possibility of claiming a deduction for casualty loss. After preliminary research in the regulations addressing casualty loss, Kitay spoke with two area real estate agents regarding the amount by which petitioners' property had decreased in value. The agents estimated the decline at 30 to 40 percent. Kitay and petitioner decided to use the more conservative 30 percent figure in calculating the deduction to be taken on petitioners' return. An expert appraisal was not obtained at this time, as Kitay felt that a typical appraisal based on values throughout the Brentwood Park area would be inconclusive as to the loss suffered by the few properties closest to the Simpson home.

Kitay and petitioner also recognized and discussed the fact that there existed a substantial likelihood of an audit focusing

on petitioners' 1994 return. Hence, to clarify the position being taken and the reasons underlying petitioners' deduction, an explanatory supplemental statement labeled "Casualty Loss" was attached to the return. After indicating the location of petitioners' property in relation to that of Simpson, it stated that the casualty loss was premised on "the calamity of the murder & trial, which was sudden & unavoidable & which resulted in a permanent loss to value of property." A table enumerating instances of minor physical damage to petitioners' property, such as damage to lawn and sprinklers, was also attached to the return, but no valuation was placed upon the harm caused thereby.

At the time petitioners purchased their property, they were aware that the existing home required remodeling and repair. In the fall of 1994, petitioners demolished most of the house. Then, in March of 1995, they began a reconstruction project costing approximately $2 million. This reconstruction was completed in December of 1996, and petitioners moved into the residence. Petitioners continued to reside at 359 North Bristol Avenue up to and through the date of trial.

Other residents of Brentwood Park have undertaken similar reconstruction projects in recent years. The Nebekers, who own the property across Ashford Street from the former Simpson residence, are proceeding with a $1 million remodeling of their

home.  Likewise, the property owned by Simpson was sold after he moved out in 1998, the existing house was demolished, and a new residence is currently being constructed.

As of early 1999, the area surrounding the former Simpson home was no longer inundated with media personnel or equipment. The police barricades restricting traffic in the immediate vicinity of petitioners' property had been removed.  Looky-loos, however, continued to frequent the neighborhood, often advised of the location of Simpson's former residence by its inclusion on "star maps" published for the Los Angeles area.  Anniversaries of the murders were also typically accompanied by periods of increased media and public attention.

OPINION

We must decide whether petitioners are entitled to a casualty loss deduction based upon a postulated decline in the value of their residential property and, if not, whether they are liable for the section 6662(a) accuracy-related penalty.

Petitioners contend that the media and onlooker attention following the murders and focusing on Simpson's home has decreased the value of their adjacent property.  They argue that because the homicides were a sudden, unexpected, and unusual event, and because aspects of the public interest precipitated thereby continued at least to the time of trial in this case, they have suffered a permanent casualty loss.  Petitioners

further allege that the proximity of their residence to that of Simpson has stigmatized their property and rendered it subject to permanent buyer resistance.

Conversely, respondent asserts that public attention over the course of a lengthy murder trial is not the type of sudden and unexpected event that will qualify as a casualty within the meaning of the Code. Respondent additionally contends that the Court of Appeals for the Ninth Circuit, to which appeal in this case would normally lie, has limited the amount that may be claimed as a casualty loss deduction to the loss suffered as a result of physical damage to property. According to respondent, since petitioners have failed to substantiate any such damage, they are entitled to no deduction. In respondent's view, any decline in market value represents merely a temporary fluctuation and not a permanent, cognizable loss.

We agree with respondent that petitioners have not established their entitlement to a casualty loss deduction. The difficulties suffered by petitioners as a consequence of their proximity to the Simpson residence do not constitute the type of damage contemplated by section 165(c)(3). However, because we find that petitioners acted reasonably and in good faith in the preparation of their tax return, no additional liability for the section 6662(a) accuracy-related penalty will be imposed.

Issue 1.  Casualty Loss

Section 165 governs the tax treatment of losses and reads in relevant part as follows:

SEC. 165.  LOSSES.

(a) General Rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

*    *    *    *    *    *    *

(c) Limitation on Losses of Individuals.--In the case of an individual, the deduction under subsection (a) shall be limited to--

*    *    *    *    *    *    *

(3) except as provided in subsection (h), losses of property not connected with a trade or business or a transaction entered into for profit, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft.

Subsection (h) of section 165 further limits the allowable deduction to the amount by which the casualty loss exceeds (1) $100 and (2) the sum of personal casualty gains plus 10 percent of the adjusted gross income of the individual.

Regulations promulgated under section 165 additionally provide that, to be allowable as a deduction, a loss must be both "evidenced by closed and completed transactions" and "fixed by identifiable events".  Sec. 1.165-1(b), Income Tax Regs.

As interpreted by case law, a casualty loss within the meaning of section 165(c)(3) arises when two circumstances are present.  First, the nature of the occurrence precipitating the

damage to property must qualify as a casualty.  See, e.g., <u>White v. Commissioner</u>, 48 T.C. 430 (1967); <u>Durden v. Commissioner</u>, 3 T.C. 1 (1944).  Second, the nature of the damage sustained must be such that it is deductible for purposes of section 165.  See, e.g., <u>Squirt Co. v. Commissioner</u>, 51 T.C. 543 (1969), affd. 423 F.2d 710 (9th Cir. 1970); <u>Pulvers v. Commissioner</u>, 48 T.C. 245 (1967), affd. 407 F.2d 838 (9th Cir. 1969); <u>Citizens Bank v. Commissioner</u>, 28 T.C. 717 (1957), affd. 252 F.2d 425 (4th Cir. 1958); <u>Kamanski v. Commissioner</u>, T.C. Memo. 1970-352, affd. 477 F.2d 452 (9th Cir. 1973).  At issue here then are whether the events surrounding the alleged Simpson murders and affecting petitioners' property can properly be termed a casualty and whether the type of loss suffered by petitioners as a consequence of these events is recognized as deductible.  We conclude that both inquiries must be answered in the negative.

A.  <u>Nature of Occurrence Constituting a Casualty</u>

The word "casualty" as used in section 165(c)(3) has been defined, through application of the principle of ejusdem generis, by analyzing the shared characteristics of the specifically enumerated casualties of fire, storm, and shipwreck.  See, e.g., <u>White v. Commissioner</u>, <u>supra</u> at 433-435; <u>Durden v. Commissioner</u>, <u>supra</u> at 3-4.  As explained by this Court:

> wherever unexpected, accidental force is exerted on property and the taxpayer is powerless to prevent application of the force because of the suddenness thereof or some disability, the resulting direct and

> proximate damage causes a loss which is like or similar to losses arising from the causes specifically enumerated in section 165(c)(3). * * * [White v. Commissioner, supra at 435.]

Hence, casualty for purposes of the Code denotes "'an undesigned, sudden and unexpected event'", Durden v. Commissioner, supra at 3 (quoting Webster's New International Dictionary), or "'an event due to some sudden, unexpected or unusual cause'", id. (quoting Matheson v. Commissioner, 54 F.2d 537, 539 (2d Cir. 1931), affg. 18 B.T.A. 674 (1930)). Conversely, the term "'excludes the progressive deterioration of property through a steadily operating cause.'" Id. (quoting Fay v. Helvering, 120 F.2d 253, 253 (2d Cir. 1941), affg. 42 B.T.A. 206 (1940)). The sudden and unexpected occurrence, however, is not limited to those events flowing from forces of nature and may be a product of human agency. See id. at 4.

Here, we cannot conclude that the asserted devaluation of petitioners' property was the direct and proximate result of the type of casualty contemplated by section 165(c)(3). While the stabbing of Nicole Brown Simpson and Ronald Goldman was a sudden and unexpected exertion of force, this force was not exerted upon and did not damage petitioners' property. Similarly, the initial influx of onlookers, although perhaps sudden, was not a force exerted on petitioners' property and was not, in and of itself, the source of the asserted decrease in the home's market value. Rather, petitioners base their claim of loss on months, or even

years, of ongoing public attention.  If neither media personnel nor looky-loos had chosen to frequent the Brentwood Park area after the murders, or if the period of interest and visitation had been brief, petitioners would have lacked grounds for alleging a permanent and devaluing change in the character of their neighborhood.  Hence, the source of their difficulties would appear to be more akin to a steadily operating cause than to a casualty.  Press and media attention extending for months bears little similarity to a fire, storm, or shipwreck and is not properly classified therewith as an "other casualty".

B.  Nature of Damage Recognized as Deductible

With respect to the requisite nature of the damage itself, this Court has traditionally held that only physical damage to or permanent abandonment of property will be recognized as deductible under section 165.  See, e.g., Squirt Co. v. Commissioner, supra at 547; Pulvers v. Commissioner, supra at 249-250; Citizens Bank v. Commissioner, supra at 720; Kamanski v. Commissioner, supra.  In contrast, the Court has refused to permit deductions based upon a temporary decline in market value. See, e.g., Squirt Co. v. Commissioner, supra at 547; Pulvers v. Commissioner, supra at 249-250; Citizens Bank v. Commissioner, supra at 720; Kamanski v. Commissioner, supra.

For example, in Citizens Bank v. Commissioner, supra at 720, the Court stated that "physical damage or destruction of property

is an inherent prerequisite in showing a casualty loss." When
again faced with taxpayers seeking a deduction premised upon a
decrease in market value, the Court further explained in Pulvers
v. Commissioner, supra at 249 (quoting Citizens Bank v.
Commissioner, 252 F.2d at 428): "'The scheme of our tax laws
does not, however, contemplate such a series of adjustments to
reflect the vicissitudes of the market, or the wavering values
occasioned by a succession of adverse or favorable
developments.'" Such a decline was termed "a hypothetical loss
or a mere fluctuation in value." Id. at 250. The Court likewise
emphasized in Squirt Co. v. Commissioner, supra at 547, that "Not
all reductions in market value resulting from casualty-type
occurrences are deductible under section 165; only those losses
are deductible which are the result of actual physical damage to
the property." This rule was reiterated yet again in Kamanski v.
Commissioner, supra, when the Court observed:

> In the instant case there was likewise relatively
> small physical damage to petitioner's property and the
> primary drop in value was due to buyer resistance to
> purchasing property in an area which had suffered a
> landslide. If there had been no physical damage to the
> property, petitioner would be entitled to no casualty
> loss deduction because of the decrease in market value
> resulting from the slide. * * *
>
>     *    *    *    *    *    *    *
>
>     * * * the only loss which petitioner is
> entitled to deduct is for the physical damage to
> his property
> * * *

Moreover, the Court of Appeals for the Ninth Circuit, to which appeal in the present case would normally lie, has adopted this rule requiring physical damage. See, e.g., Kamanski v. Commissioner, 477 F.2d at 452; Pulvers v. Commissioner, 407 F.2d 838, 839 (9th Cir. 1969), affg. 48 T.C. 245 (1967). In Pulvers v. Commissioner, supra at 839, the Court of Appeals reviewed the specific casualties enumerated in section 165(c)(3) and concluded: "Each of those surely involves physical damage or loss of the physical property. Thus, we read 'or other casualty,' in para materia, meaning 'something like those specifically mentioned.'" Even more explicitly, the Court of Appeals based affirmance in Kamanski v. Commissioner, supra at 452, on the following grounds:

> The Tax Court ruled that the loss sustained was a nondeductible personal loss in disposition of residential property and not a casualty loss; that the drop in market value was not due to physical damage caused by the [earth]slide, but to "buyer resistance"; that casualty loss is limited to damage directly caused by the casualty. We agree.

Furthermore, two recent opinions from U.S. District Courts within the Ninth Circuit, although nonbinding and not officially reported, nonetheless serve as an indication that the Court of Appeals has not rejected the physical damage requirement. In Gordon v. United States, No. C-94-4210 MHP (N.D. Cal., July 3, 1995), affd. without published opinion 82 F.3d 422 (9th Cir. 1996), the District Court, citing the appellate decision in

Pulvers v. Commissioner, supra, stated: "Section 165 of the IRC covers only casualty losses arising from physical damage caused by one of the enumerated casualties or by other, similar casualties", and the Court of Appeals affirmed.

In Caan v. United States, 83 AFTR 2d 99-1640, 99-1 USTC par. 50,349 (C.D. Cal. 1999), the District Court dismissed for failure to state a claim the complaint of taxpayers alleging facts nearly identical to those at issue here. The Caans, residents of Brentwood Park, argued that they were entitled to a section 165(c)(3) casualty loss deduction for the decline in market value and permanent buyer resistance to which they asserted their property became subject as a result of the "'O.J. Simpson double murders'". Id. at 99-1641 n.2, 99-1 USTC par. 50,349, at 87,829 n.2. The court, however, reiterated that "the Ninth Circuit only recognizes casualty losses arising from physical damage caused by enumerated or other similar casualties" and held that "Because the Caans have not alleged any physical damage to their property due to the murders and subsequent media frenzy, they have not alleged a casualty loss that is a proper basis for a deduction." Id. at 99-1641, 99-1 USTC par. 50,349, at 87,829.

Given the above decisions, we conclude that petitioners here have failed to establish that their claimed casualty loss is of a type recognized as deductible for purposes of section 165(c)(3). They have not proven the extent to which their property suffered

physical damage, and their attempt to base a deduction on market devaluation is contrary to existing law.

With respect to physical damage and assuming arguendo that petitioners' loss stemmed from an occurrence that could properly be deemed a casualty, they would be entitled to a deduction for physical harm to their property. Nonetheless, although petitioners attached to their return a list of minor instances of physical damage and mentioned several other items at trial, they have neither offered evidence of the monetary value of nor provided any substantiation for such losses. We therefore have no basis for determining what, if any, portion of the claimed deduction might be allowable, and we cannot sustain a $751,427 deduction on the grounds of damage to a lawn or a sprinkler system.

As regards decrease in property value, petitioners' efforts to circumvent the established precedent repeatedly rejecting deductions premised on market fluctuation, through reliance on Finkbohner v. United States, 788 F.2d 723 (11th Cir. 1986), are misplaced. In Finkbohner v. United States, supra at 727, the Court of Appeals for the Eleventh Circuit permitted a deduction based on permanent buyer resistance in absence of physical damage. The Finkbohners lived on a cul-de-sac with 12 homes, and after flooding damaged several of the houses, municipal authorities ordered 7 of the residences demolished and the lots

maintained as permanent open space.  See id. at 724.  Such irreversible changes in the character of the neighborhood were found to effect a permanent devaluation and to constitute a casualty within the meaning of section 165(c)(3).  See id. at 727.

However, as explicated above, this Court has long consistently held that an essential element of a deductible casualty loss is physical damage or, in some cases, physically necessitated abandonment.  Furthermore, under the rule set forth in Golsen v. Commissioner, 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971), we are in any event constrained to apply the law of the court in which an appeal would normally lie.  Since the Court of Appeals for the Ninth Circuit has adopted and has not diverged from a requirement of physical damage for a section 165(c)(3) deduction, to hold otherwise would contravene Golsen.

Moreover, we further note that petitioners' circumstances do not reflect the type of permanent devaluation or buyer resistance which would be analogous to that held deductible in Finkbohner v. United States, supra.  The evidence in the instant case reveals that media and onlooker attention has in fact lessened significantly over the years following the murders.  Access to petitioners' property is no longer restricted by media equipment or police barricades.  Residents of Brentwood Park have continued

to invest substantial funds in remodeling and upgrading their homes.  Hence, petitioners' difficulties are more akin to a temporary fluctuation in value, which no court has found to support a deduction under section 165(c)(3).  We therefore hold that petitioners have failed to establish their entitlement to a casualty loss deduction.  Respondent's determination of a deficiency is sustained.

Additionally, in light of our holding that the element of physical damage must be present, we also grant respondent's motion in limine to exclude the report of petitioners' expert, Randall Bell (Bell), a real estate appraiser.  Bell's report focuses on the diminution in value that can result from the stigma which attaches to crime scene property.  As this information relates solely to the issue of buyer resistance, the report is irrelevant to our decision.  Furthermore, we note that because Bell bases his conclusions on studies of actual murder scenes and offers no examples or statistics regarding the effect of a homicide on values of either neighboring properties or the killer's residence, the probative worth of his report, even if admitted, would at best be minimal.

Issue 2.  Accuracy-Related Penalty

Section 6662(a) and (b)(1) imposes an accuracy-related penalty in the amount of 20 percent of any underpayment that is attributable to negligence or disregard of rules or regulations. "Negligence" is defined in section 6662(c) as "any failure to make a reasonable attempt to comply with the provisions of this title", and "disregard" as "any careless, reckless, or intentional disregard."  Case law similarly states that "Negligence is a lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances."  Freytag v. Commissioner, 89 T.C. 849, 887 (1987) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. on this issue 43 T.C. 168 (1964) and T.C. Memo. 1964-299), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991).

An exception to the section 6662(a) penalty is set forth in section 6664(c)(1) and provides:  "No penalty shall be imposed under this part with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion."  The taxpayer bears the burden of establishing that this reasonable cause exception is applicable, as the Commissioner's determination of an accuracy-related penalty is presumed correct.  See Rule 142(a).

Regulations interpreting section 6664(c) state:

> The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. * * * Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability. * * * [Sec. 1.6664-4(b)(1), Income Tax Regs.]

Furthermore, reliance upon the advice of an expert tax preparer may, but does not necessarily, demonstrate reasonable cause and good faith in the context of the section 6662(a) penalty. See id.; see also Freytag v. Commissioner, supra at 888. Such reliance is not an absolute defense, but it is a factor to be considered. See Freytag v. Commissioner, supra at 888. In order for this factor to be given dispositive weight, the taxpayer claiming reliance on a professional such as an accountant must show, at minimum, that (1) the accountant was supplied with correct information and (2) the incorrect return was a result of the accountant's error. See, e.g., Ma-Tran Corp. v. Commissioner, 70 T.C. 158, 173 (1978); Pessin v. Commissioner, 59 T.C. 473, 489 (1972); Garcia v. Commissioner, T.C. Memo. 1998-203, affd. without published opinion 190 F.3d 538 (5th Cir. 1999).

Applying these principles to the instant case, we conclude that petitioners have sustained their burden of establishing reasonable cause and good faith for the deduction taken on their return. Petitioner first inquired of his real estate agent, an

experienced broker, regarding a potential decline in value as a result of events stemming from the alleged Simpson murders. He then sought advice from his accountant Kitay concerning the propriety of a casualty loss deduction. Kitay, in turn, discussed devaluation with two additional real estate brokers. Kitay's opinion that a typical appraisal would be inconclusive as to petitioners' property also appears to have played a significant role in the decision not to seek such an evaluation.

Moreover, the explanatory statement prepared by Kitay and attached to petitioners' return indicates, on the part of petitioners, both communication to the accountant of relevant information and good faith. Petitioners supplied Kitay with factual data related to the nature of the loss, and they chose to make full disclosure rather than to obscure the reasons for their deduction. We therefore conclude that petitioners did not exhibit the type of unreasonableness or imprudence that would support imposition of the section 6662(a) accuracy-related penalty.

We further observe that on brief respondent alternatively contends that petitioners should be held liable for the section 6662(a) penalty on the grounds of a substantial understatement of income tax. See sec. 6662(b)(2). We note, however, that the notice of deficiency sent to petitioners reads, in the section explaining the accuracy-related penalty: "Underpayment due to

negligence 291,931", followed by "Underpayment due to substantial understatement 0".  As respondent has not amended his pleadings to assert an underpayment due to substantial understatement, this issue was not properly raised.  In addition, we also observe that the section 6664(c) reasonable cause exception is equally applicable in the case of a section 6662(a) penalty attributed to a substantial understatement of income tax.  Respondent's determination of an accuracy-related penalty is denied.

To reflect the foregoing,

<u>An appropriate order will be issued, and decision will be entered for respondent with respect to the deficiency and for petitioners with respect to the accuracy-related penalty</u>.