STATE OF MINNESOTA

IN SUPREME COURT

A16-0725

Tax Court                                                          Gildea, C.J.

Jennifer L. Mandel and Eric P. Mandel,

　　　　　　Relators,

vs.                                                     Filed:  December 14, 2016
                                                        Office of Appellate Courts
Commissioner of Revenue,

　　　　　　Respondent.

_____

Mark A. Pridgeon, David L. Zoss, Edina, Minnesota, for relators.

Lori Swanson, Attorney General, Michael Goodwin, Assistant Attorney General, Saint Paul, Minnesota, for respondent.

_____

S Y L L A B U S

1.　　The tax court did not err in holding that the taxpayer's post-casualty-loss appraisal was not a "competent appraisal" under Treas. Reg. § 1.165-7(a)(2)(i) (as amended in 1977).

2.　　The tax court did not err in granting summary judgment to the Commissioner of Revenue.

Affirmed.

Considered and decided by the court without oral argument.

1

O P I N I O N

GILDEA, Chief Justice.

This case comes to us after the tax court upheld the Commissioner of Revenue's partial disallowance of a casualty-loss deduction. Relators Jennifer and Eric Mandel argue that the tax court erred in holding that the post-casualty-loss appraisal they relied on to support their casualty-loss deduction was not "competent" within the meaning of the applicable treasury regulation. Additionally, the Mandels argue that the tax court improperly granted summary judgment to the Commissioner. Because we conclude that the tax court did not err in determining that the Mandels' post-casualty-appraisal was not "competent" and the tax court properly granted summary judgment, we affirm.

In May 2010, the Mandels purchased a home in Minnetonka for $391,000. On March 22, 2011, rainwater entered the Mandels' home, damaging the foundation wall and the floors and walls in the laundry room. The Mandels installed drain tile and a sump pump; replaced sheetrock, electrical components, and flooring that had been damaged by the water intrusion; and performed some landscaping. The Commissioner accepted proof that the Mandels spent $27,411 to repair the property.[1] There is no evidence that any other home in the Mandels' area suffered a loss around the same time. And there is no evidence of a general market decline that would have affected the fair market value of the Mandels' property at the time of the damage.

---

[1] The Mandels filed a claim with Allstate Insurance, but their claim was denied.

In March 2012, the Mandels had Reliatel Appraisals perform two retrospective appraisals in anticipation of claiming a casualty loss on their 2011 tax return. Reliatel appraised the property as of March 21, 2011 (the day before the property was damaged), and as of March 23, 2011 (just after the property was damaged, but before it was repaired). The appraiser determined that the fair market value of the Mandels' property before the damage was $400,000. In reaching this valuation, the appraiser relied on a sales comparison approach, comparing the Mandels' property with similar homes in the area and making adjustments on the basis of lot size, home size, number of bedrooms, and other similar metrics. The appraiser then determined the fair market value of the property just after the damage to be $298,000, a $102,000 decline from the initial appraisal.[2] The appraiser calculated the estimated value by subtracting from the pre-casualty market value the cost of repairs multiplied by 2.6. The appraiser determined the cost of repairs to be roughly $40,000, including the nearly $30,000 the Mandels already spent to repair the property in addition to $10,000 for further landscaping to reduce the risk of future flooding. The appraiser multiplied these costs for repairs and improvements by 2.6 because, in his experience, buyers are reticent to purchase homes with water damage, "as they carry a

---

[2] Throughout the briefs, the tax court opinion, and the tax court documents, the parties sometimes indicate that the claimed loss was $104,000, not $102,000. The loss claimed on the Mandels' tax return was $102,000. The tax court notes this inconsistency. *Mandel v. Comm'r of Revenue*, No. 8787-R, 2016 WL 903301, at *3 n.2 (Minn. T.C. Mar. 8, 2016). The confusion seems to arise from the appraiser's estimates. The appraiser calculated the loss in value to be $104,000 (2.6 x $40,000 = $104,000). For whatever reason, when the appraiser subtracted $104,000 from the pre-loss appraisal value of the home, he concluded that the home was worth $298,000. Because the Mandels claimed a loss of only $102,000 on their tax return, we use $102,000.

stigma in the marketplace." According to the appraiser, the buyer pool for water-damaged homes is typically limited to investors, who will only purchase a home if the cost of the property is reduced by roughly 2.6 times the cost of repairs.

Based on the Reliatel appraisal, the Mandels deducted $82,247 from their income reflected on their 2011 federal tax return.[3] This deduction also affected the Mandels' Minnesota taxable income because Minn. Stat. § 290.01, subd. 19 (2014), defines "net income" as "federal taxable income."

Following an audit, the Commissioner disallowed much of the Mandels' casualty-loss deduction. Specifically, the Commissioner reduced the allowable tax deduction to $7,658, based on the cost of the repairs the Mandels actually made to their home.[4]

The Mandels appealed the Commissioner's determination to the tax court. *Mandel v. Comm'r of Revenue*, No. 8787-R, 2016 WL 903301, at *3 (Minn. T.C. Mar. 8, 2016). On cross-motions for summary judgment, the tax court determined that the Reliatel

---

[3]    To reach this number, the Mandels took the $102,000 claimed casualty loss and subtracted 10% of their adjusted gross income and $100 ($102,000 − 10% (adjusted gross income) − $100 = $82,247). *See* I.R.C. § 165(h) (2012) ("Any loss of an individual described in subsection (c)(3) shall be allowed only to the extent that the amount of the loss to such individual arising from each casualty . . . exceeds . . . $100 . . . . If the personal casualty losses for any taxable year exceed the personal casualty gains for such taxable year, such losses shall be allowed for the taxable year only to the extent of the sum of— (i) the amount of the personal casualty gains for the taxable year, plus (ii) so much of such excess as exceeds 10 percent of the adjusted gross income of the individual."); Treas. Reg. § 1.165-7(b)(4) (as amended in 1977) (preventing claimants from deducting the first $100 in casualty losses).

[4]    To reach this number, the Commissioner took the $27,411 in repair costs minus 10% of the Mandels' adjusted gross income and $100 ($27,411 − 10% (adjusted gross income) − $100 = $7,658). *See* I.R.C. § 165(h)(2).

appraisal of the post-casualty value of the home was not a "competent appraisal" under Treas. Reg. § 1.165-7(a)(2)(i) (as amended in 1977). Consequently, the tax court granted the Commissioner's motion for summary judgment and denied the Mandels' motion. 2016 WL 903301, at *10. The Mandels challenge both of these decisions.

## I.

We turn first to the Mandels' contention that the tax court erred in determining that the Reliatel appraisal was not a "competent appraisal" under the relevant treasury regulation. In defining federal taxable income, the Internal Revenue Code allows deductions for "any loss sustained during the taxable year and not compensated for by insurance or otherwise." I.R.C. § 165(a) (2012). Treasury Regulation § 1.165-7(a)(1) (as amended in 1977), states that "any loss arising from . . . casualty is allowable as a deduction under section 165(a)." To determine the allowable deduction under I.R.C. § 165(a), the taxpayer must compare "the fair market value of the property immediately before and immediately after the casualty" and generally must determine the fair market values "by competent appraisal." Treas. Reg. § 1.165-7(a)(2)(i).

Regulation 1.165 does not define "competent appraisal," and we have not had occasion to do so. The tax court interpreted the term to include, at a minimum, compliance with applicable law, *Mandel*, 2016 WL 903301, at *5. Federal courts interpreting this same provision have reached a similar conclusion. *See, e.g.*, *Kamanski v. Comm'r*, 29 T.C.M. (CCH) 1702, 1706 (1970) (disregarding an appraisal that relied on factors inconsistent with the treasury regulation). Thus, a "competent appraisal" for the purposes of Treas. Reg.

5

§ 1.165-7(a)(2)(i) values the property in accordance with the applicable treasury regulations.[5]

The tax court concluded that the Reliatel appraisal was not competent for two reasons. First, the appraisal considered future improvements to the home in calculating the loss. *Mandel*, 2016 WL 903301, at *6-7. Second, the appraisal considered potential buyers' temporary aversion to purchasing a water-damaged home. *Id.* at *6-9. The tax court concluded that both of these considerations contravened the applicable treasury regulation, resulting in an appraisal that was not competent. *Id.* at *10.[6]

The Mandels challenge both aspects of the tax court's competency conclusion. Specifically, they argue that the Reliatel appraisal considered only those repairs that would fix the home and prevent future flooding damage. Additionally, the Mandels contend that casualty-loss appraisals may properly consider buyer resistance to homes that have sustained flooding damage. We address each argument in turn.

With respect to the Mandels' first argument, it is undisputed that the Reliatel appraisal considered future improvements to the home in addition to the cost of the repairs

---

[5] The Mandels also rely on the expert opinion of Robert La Fond, a Minnesota State Certified Real Property Appraiser, who explained that the opinions expressed in the Reliatel appraisal were reasonably formed in accordance with the Uniform Standards of Professional Appraisal Practice. But the question is not whether the Reliatel appraisal is admissible, it is whether the appraisal is "competent" under the treasury regulation. La Fond's opinion has no bearing on that question.

[6] The Mandels interpret the tax court's opinion to say that both the pre-casualty and post-casualty appraisals were not competent. But the Commissioner does not dispute that the pre-casualty appraisal was "competent" under the regulation. Accordingly, we do not address whether the pre-casualty appraisal was competent.

actually made to the property. Specifically, in valuing the Mandels' property after the water damage, the appraisal included an estimated $10,000 for landscaping that had not been done, but that if completed, would prevent future flooding. In other words, completing this new landscaping would not have repaired any damage already caused by the flooding, but would serve only to prevent future water damage. Under Treas. Reg. § 1.165-7(a)(2)(i), however, the post-casualty value of the property does not include the cost of future capital improvements. Allowable casualty losses instead are limited to "the actual loss resulting from damage to the property." *Id.* Future improvements to the property may reduce the risk of future harm, but they are not improvements that fix existing damage. Accordingly, such expenses are not properly included within the casualty-loss appraisal. *See Solomon v. Comm'r*, 39 T.C.M. (CCH) 1282, 1284 (1980) (disallowing a casualty-loss deduction based on the estimated cost of regrading the property to prevent future flooding).[7] The tax court therefore did not err in determining that the Reliatel appraisal was inconsistent with the treasury regulation to the extent that it included the costs of future improvements to the Mandels' property.

We next consider whether, as the Mandels argue, the Reliatel appraisal properly included the impact of buyer resistance to water-damaged homes in its calculation of the post-casualty value of the Mandels' property. Treasury Regulation § 1.165-7(a)(1)

---

[7] The Mandels argue that *Solomon* is not applicable here because in that case the taxpayers did not offer a formal appraisal. The federal tax court nevertheless considered whether it was possible to include costs of future improvements along with the repair costs incurred in connection with property damage, and its analysis was unaffected by the absence of an appraisal. *Solomon*, 39 T.C.M. (CCH) at 1284.

authorizes deductions for "any loss arising from fire, storm, shipwreck, or other casualty . . . for the taxable year in which the loss is sustained." Courts have interpreted this provision to allow deductions for *physical* damage to property, but not necessarily an intangible impact on the value of property. *Pulvers v. Comm'r*, 407 F.2d 838, 839 (9th Cir. 1969). In other words, the treasury regulation does not authorize deductions based upon psychological factors, such as temporary buyer resistance to the property. *Kamanski v. Comm'r*, 477 F.2d 452, 452-53 (9th Cir. 1973); *Chamales v. Comm'r*, 79 T.C.M. (CCH) 1428, 1431 (2000) (rejecting a casualty claim based on the temporary drop in value of a home located near the murders of Nicole Simpson and Ronald Goldman). Courts therefore have consistently held that a potential buyer's hesitancy to purchase a water-damaged property is not includable as part of a casualty-loss appraisal. *Solomon*, 39 T.C.M. (CCH) at 1284 (concluding that buyer resistance to flooded homes is not part of a deductible casualty loss); *Ford v. Comm'r*, 33 T.C.M. (CCH) 496, 498 (1974) (citing *Thornton v. Comm'r*, 47 T.C. 1 (1966)) (limiting a claimed casualty loss to the actual loss from flooding damage, and excluding buyer resistance to the flood-damaged home from the calculation of the home's value); *Peterson v. Comm'r*, 30 T.C. 660, 664-65 (1958) (disallowing a deduction that exceeded the cost to repair flood damage because it was related to market fluctuations, not to the damage itself). In addition to these cases, the IRS issued a ruling in 1966 discussing casualty losses from flooding and the applicability of buyer resistance in determining the post-casualty-loss value of affected homes. Rev. Rul. 66-242, 1966-2 C.B. 56. The Revenue Ruling stated that "[t]he phenomenon of a decline and rise in market value which commonly occurs after a flood due to psychological resistance to inundated

8

properties is usually short lived and is more often than not a mere 'fluctuation' in value."

*Id.* The IRS concluded that such a rise or fall in market value "does not represent an actual loss resulting from damage to the property." *Id.*[8]

In this case, the Reliatel appraisal calculated the value of the Mandels' property by relying, in part, on buyers' psychological resistance to purchasing water-damaged homes. The post-casualty appraisal based its valuation on the assumption that the pool of buyers for a water-damaged home would "be limited to investors[,] as owner occupants are typically unwilling to take on such a significant repair project especially when dealing with water issues as they carry a stigma in the marketplace." Because of this stigma, the appraisal estimated the reduction in property value to be lower than it otherwise would have been without the stigma. This psychological stigma against water-damaged homes is a common example of temporary buyer resistance. *See, e.g.*, *Finkbohner v. United States*, 788 F.2d 723, 727 (11th Cir. 1986) ("[E]vidence showing willing buyers temporarily pay less for property only recently subjected to flooding, will not by itself justify retaining in

---

[8] The Mandels ask us to adopt an alternative approach to temporary buyer resistance. The Mandels' approach would allow a taxpayer to use buyer resistance in calculating the change in a property's market value if (1) there is actual loss resulting from physical damage, (2) the damage is limited to one property, and (3) there is no general market decline in property values. But such a test has no grounding in the applicable treasury regulations or case law. Treasury Regulation § 1.165-7(a)(2)(i) limits casualty losses to "actual loss resulting from damage to the property." The regulation does not contain an exception to this limitation if the taxpayer can prove physical damage to a single property when there is no general market decline. Moreover, such a test would run counter to federal tax court decisions on this very issue. *See, e.g.*, *Solomon*, 39 T.C.M. (CCH) at 1284 (declining to allow a deduction on the basis of temporary buyer resistance when only one property was physically damaged, and there was no evidence of a general market decline); *Ford*, 33 T.C.M. (CCH) at 498 (same). For these reasons, we decline to adopt the Mandels' alternative approach.

9

an award determined by loss in market value, the portion ascertainably or inferentially due to such a factor."). Based on this analysis, we agree with the tax court that the Reliatel appraisal improperly included the effect of the stigma in determining the property's value.

In urging us to reverse the tax court, the Mandels argue that even if the Reliatel appraisal considered buyer resistance, such a consideration was proper because the buyer resistance was permanent, not temporary. The Commissioner contends that this situation does not present permanent buyer resistance because the decrease in the home's value is associated only with a temporary stigma, not a permanent change to the nature of the property. We agree with the Commissioner.

Courts may look to *permanent* buyer resistance when evaluating a casualty loss. *Finkbohner*, 788 F.2d at 724-25. Permanent buyer resistance occurs when a property is destroyed or when damage to the property is permanent. *Id.* at 724-25. For example, in *Finkbohner*, a taxpayer's neighborhood flooded, and several homes, including the taxpayer's, were damaged. *Id.* at 724. Following the flood, the city condemned several flooded homes in the taxpayer's neighborhood, demolished them, and prevented others from building in the area. *Id.* The appraisal of the taxpayer's property included the reduced value of the location due to the loss of other homes in the area. *Id.* at 724. The Eleventh Circuit held that this was an acceptable factor to include in a casualty-loss appraisal, reasoning that the decline in value did not relate to the fear of future flooding, but to the permanent physical change in the nature of the property after the flood. *Id.* at 727.[9]

---

[9] The tax court and the parties discuss another case, *Conner v. United States*, in the context of permanent buyer resistance. 439 F.2d 974 (5th Cir. 1971). In *Conner*, a

10

The Mandels interpret *Finkbohner* to mean that if damage occurs to a property, an appraisal may consider the stigma from that damage. We disagree. *Finkbohner* limits deductible casualty losses to permanent physical changes to the property. Here, the Mandels offered no evidence that the flooding permanently changed the structure or character of the property. The home remained habitable and the Mandels fully repaired the damage. Any buyer resistance, in other words, was only temporary, not permanent. Thus, the tax court did not err in concluding that the Reliatel appraisal was inconsistent with the treasury regulation because it included temporary buyer resistance in the property's valuation.

---

taxpayer's home was "virtually destroyed by fire." *Id.* at 975. The taxpayer claimed a casualty loss based upon the difference in appraisal value of the home before and after the casualty. *Id.* Even though the claimed loss was greater than the cost to repair the property, the Fifth Circuit held that the use of an appraisal value was permitted. *Id.* at 980. The appraisal value considered not only the state of the home but also the costs associated with housing while waiting for the home to be rebuilt and the loss in use value of the home during reconstruction. *Id.* at 981. The court did not discuss whether the home's value was reduced by potential buyers' fears of future fires in the home.

The Mandels interpret *Conner* to mean that when "there [is] no 'permanent damage' and the property ha[s] been fully restored, the loss [is] set at the time of the casualty loss, and the regulations require[] the application of the before and after test." This interpretation is incorrect. But the court in *Conner* did not hold that the appraisal value was the exclusive measure of the casualty loss in those circumstances. *Conner* simply held that the district court's decision to use the appraisal value was not erroneous. 439 F.2d at 986. Additionally, because *Conner* does not expressly state whether the valuation of the home relied upon buyer resistance, the case is not helpful in deciding whether the Reliatel valuation is competent in this case. As the court in *Finkbohner* put it, " 'buyer resistance' due to the casualty itself was not the problem in *Conner*, and is not likely to be in case of a dwelling restored after fire damage, quite unlike the situation with flood damage." 788 F.2d at 725-26.

Based on our analysis, we agree with the tax court that the Reliatel appraisal included two factors in its valuation determination that the treasury regulation does not permit to be used when determining the property's value. Because the appraisal improperly considered these two factors, we hold that the tax court did not err in determining that the Reliatel appraisal was not a "competent appraisal" under Treas. Reg. § 1.165-7(a)(2)(i).

II.

We next turn to the question of whether the tax court properly granted the Commissioner's motion for summary judgment. We review appeals from summary judgment to determine "whether there are any genuine issues of material fact and whether the lower court erred in its application of the law." *Brookfield Trade Ctr., Inc. v. Cty. of Ramsey*, 584 N.W.2d 390, 392-93 (Minn. 1998). But when, as in this case, the parties bring cross-motions for summary judgment, we have recognized that they "tacitly agree[] that there are no genuine issues of material fact." *Am. Family Mut. Ins. Co. v. Thiem*, 503 N.W.2d 789, 790 (Minn. 1993). Accordingly, the only question before us is whether the tax court erred in its application of law; that is a question we review de novo. *Melrose Gates, LLC v. Chor Moua*, 875 N.W.2d 814, 819 (Minn. 2016) (citing *Medica, Inc. v. Atl. Mut. Ins. Co.*, 566 N.W.2d 74, 77 (Minn. 1997)).

The Mandels claim that the tax court erred in granting summary judgment to the Commissioner, rather than the Mandels, for three reasons. First, the Mandels contend that the tax court erred in concluding that the appraisal was not competent under the federal tax regulations. Second, the Mandels argue that when viewed in the light most favorable to them, the appraisals in the record prove a casualty loss based on the reduction of the

12

appraisal value of their home. Third, the Mandels claim that because the Commissioner did not establish a disputed issue of material fact, they are entitled to summary judgment. We are not persuaded.

For the reasons discussed above, the tax court did not err when it determined the appraisal was not competent under Treas. Reg. § 1.165-7(a)(2)(i). Regarding the Mandels' second argument, it is true that when determining whether issues of material fact preclude summary judgment, we view the facts in the light most favorable to the party against whom summary judgment was entered. *Lubbers v. Anderson*, 539 N.W.2d 398, 401 (Minn. 1995). But in this case that analysis is not necessary because there are no disputed issues of material fact. Thus, we have no occasion to examine the evidence in the light most favorable to either party.

Finally, we disagree with the Mandels that the tax court erred in its application of the law in granting summary judgment to the Commissioner. Given the prima facie validity of the Commissioner's order, Minn. Stat. § 271.06, subd. 6 (2014), and the lack of evidence supporting the Mandels' claimed casualty-loss deduction once the Reliatel appraisal was determined not to be a "competent appraisal" under Treas. Reg. § 1.165-7(a)(2)(i), we hold that the tax court did not err in granting the Commissioner's motion for summary judgment.

Affirmed.

13